IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| BRENDA BATES, as Representative of the Estate of Jimmy Atchison and on behalf of his minor children; and LAKEISHA JAMES,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF ATLANTA, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:20-CV-04074-AT<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANT CITY OF ATLANTA'S MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(6) |

## I.   INTRODUCTION

This civil rights action arises from the unjustified killing of an unarmed Black man—21-year-old Jimmy Atchison ("Mr. Atchison")—on January 22, 2019, by an Atlanta police officer serving an arrest warrant while detailed to a joint federal/local task force. Defendant City of Atlanta filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6), arguing that Plaintiffs' Complaint should be dismissed because (1) its police officers were not acting "under of color of state law" for purposes of 42 U.S.C § 1983 and therefore there can be no municipal liability under *Monell*; (2) Plaintiffs have not sufficiently alleged a basis for municipal liability under *Monell*; and (3) the wrongful death claim should be dismissed.

For the reasons discussed below, this Court should deny Defendant City of Atlanta's motion to dismiss.

## II.   THE COMPLAINT'S FACTUAL ALLEGATIONS

The City of Atlanta ("the City") controls the Atlanta Police Department ("APD") and is responsible for setting APD's policies, procedures, and customs. *See* Compl. ¶¶ 23, 129. At some point prior to January 2019, APD entered into an agreement with the FBI to permit its officers, including Defendants, to voluntarily participate in a joint task force with the FBI (the "Agreement"). *Id*. ¶¶ 22, 23. In the Agreement, APD expressly retained the power and responsibility to enforce laws, regulations, policies, procedures, and personnel rules applicable to APD officers and further agreed that APD officers would continue to report to APD for *all* administrative matters, including those that arose from the officers' participation on the task force. *Id*. ¶¶ 23, 45. That task force was the Atlanta Metro Major Offender Task Force (the "AMMO Task Force"). *Id*. ¶¶ 22, 23. In exchange for Defendant officers' participation in the AMMO Task Force, the City and APD received federal money for overtime, weapons, and other things of value. *Id*. ¶¶ 3, 37, 42 & fn. 3.

One of the policies APD agreed would remain applicable to Defendant officers was a categorical requirement that all sworn APD employees—of the rank of sergeant and below—be required to wear and use a body camera during the

course of their job duties. *Id*. ¶ 43. Per the City's policy, officers' body cameras "shall" be in recording mode during "[a]ll calls for service on or off duty"; for "Vehicle and Foot Pursuits"; during "[e]xecution of a search warrant"; "[w]hile interacting with the public in a law enforcement capacity"; and "for [a]ny use of force by an employee which does not result in a physical arrest." *Id*. ¶ 43. There is no exception for officers participating in federal task forces.

Indeed, when APD adopted this body-camera policy, the City knew that requiring body cameras would reduce the excessive use of force by police officers as well as citizen complaints against officers. *Id*. ¶ 44. When the Atlanta City Council voted to fund body cameras for all APD officers, evidence indicated that when officers began using body cameras in California, use of force by police dropped fifty-nine percent and citizen complaints against officers dropped eighty-seven percent. *Id*. ¶ 44. The APD body camera policy was written to produce similar results in Atlanta. *Id*. ¶ 44.

Regardless, the AMMO Task Force forbade the use of body cameras, and though the City and APD knew of the AMMO Task Force's "no filming" policy, the City did nothing to enforce the Agreement or its policies or to discipline APD officers working on the AMMO Task Force who violated them. *Id*. ¶¶ 45–46; 84. Therefore, before Mr. Atchison's death, both the City's police supervisors and Defendant officers knew they would not be wearing mandatory body cameras

meant to discourage use of excessive force while operating with the AMMO Task Force. *Id.* ¶ 46. In short, the very participation in the AMMO Task Force required a violation of the APD's policies. Furthermore, the City also knew that several APD officers assigned to the AMMO Task Force had histories of using excessive force against citizens. *Id.* ¶¶ 86–91. The City also knew that it was placing officers on the task force whom it had previously investigated for use of excessive force and was, in effect, abdicating responsibility for enforcement of its personnel rules, regulations, and policies to an agency, the FBI, that has not disciplined a single agent "for at least two decades . . . for any instance of deliberately shooting someone."[1] *Id.* ¶ 41, 42.

So despite the City's decision to remain responsible for enforcing its own use of force policy, body camera policy, and all other police department regulations over the APD officers on the AMMO Task Force; despite the City's knowledge that many of the specific officers loaned had prior histories of use of excessive force; and despite the City's knowledge that evidence and allegations of excessive use of force in at least 150 agent-involved shootings over more than two decades has been swept under the carpet by the FBI and the Justice Department,

---

[1] *The F.B.I. Deemed Agents Faultless in 150 Shootings*, N.Y. Times (June 17, 2013), https://www.nytimes.com/2013/06/19/us/in-150-shootings-the-fbi-deemed-agents-faultless.html.

the City and APD permitted these APD officers to participate in the "regulatory no-man's land" of the AMMO Task Force through June 2019.[2] The City and APD elected to look the other way when its officers violated its rules on body cameras, and after the Atchison shooting, the City and APD abdicated responsibility for conducting an investigation into Defendant Kim's use of excessive force to the FBI—knowing the FBI would find no wrongdoing because it never does. *Id*. ¶¶ 29–31, 40–42 & fn. 3, 46.[3]

Part of the authority given to APD officers deputized to work on the AMMO Task Force was the ability to obtain and execute federal Unlawful Flight to Avoid Prosecution warrants ("UFAP warrants") based on probable cause that a state-law warrant subject was an interstate flight risk. *Id*. ¶ 24–25. In or about January 2019, Defendant Sung Kim and other APD officers working on the AMMO Task Force abused that authority and manufactured a basis for obtaining a federal UFAP warrant for the arrest of Jimmy Atchison by misrepresenting to the U.S. District Court for the Northern District of Georgia that the Atlanta native, whom Defendants later attempted to arrest *in Atlanta*, was a flight risk. *Id*. ¶¶ 2, 25.

---

[2] In or around June 2019, the City finally withdrew its officers from all federal task forces, citing the incident giving rise to Plaintiffs' claims here, as well as the federal prohibition on body cameras. *Id*. ¶ 85.

[3] Not surprisingly, the FBI, in its internal investigation, made it a point to note that it would make *no determination* on the shooting of Mr. Atchison because it was APD who was responsible for enforcing its own use of force policies and not the FBI. Compl. ¶¶ 29, 42, 74, 75.

Notwithstanding the fact that Defendant officers suspected Mr. Atchison of a *state*-law crime—and had already obtained a *state*-law warrant for his arrest at his *Atlanta* home address—the UFAP warrant was critical to artificially creating federal involvement in this otherwise entirely *state*-law matter.[4] *Id.* ¶¶ 24, 25. This bogus, manufactured federal jurisdiction was purposefully designed to thwart efforts by Atlanta citizens to hold officers accountable for constitutional violations and to allow the City to engage in a legal game of "whack-a-mole" calculated to provide legal and political cover helping both the FBI and the City avoid responsibility for the actions of these task force officers. *Id.* ¶¶ 29, 30, 31.

But while Defendants did have a state-law arrest warrant and a federal fugitive warrant, Defendants did *not* have a search warrant or consent to enter the apartment of Plaintiff Lakeisha James. *Id.* ¶ 26. Undeterred, Defendants broke through the door to Ms. James' apartment to arrest Mr. Atchison, who did not live at the apartment but had arrived there earlier that morning to provide childcare for his eleven-month-old son while Ms. James worked. *Id.* ¶ 26, 58. Mr. Atchison escaped through a window and fled on foot, running partially unclothed and clearly unarmed through the apartment complex. *Id.* ¶ 61.

During their search for Mr. Atchison, Defendant officers threatened

---

[4] An FBI internal investigation later found that there was no evidence that Mr. Atchison was an interstate flight risk. *Id.* ¶¶ 25, 79.

occupants of other apartments with jail to gain warrantless, illegal entry into their homes. *Id*. ¶¶ 27, 32, 64, 78, 83. Defendant officers eventually entered the last apartment in violation of their own policies and operations plan, which required them to remain outside of the unit and to call in a SWAT team. *Id*. ¶ ¶ 27, 64. Inside, they found the unarmed Mr. Atchison, hiding in the closet. *Id*. ¶ 27. As Mr. Atchison attempted to obey conflicting officer commands to "not move" and "show his hands," Defendant Kim shot Mr. Atchison in the face with a hollow-point bullet, killing him, rather than simply taking him into custody. *Id*. ¶ 28.

## III.   STANDARD

At the motion to dismiss stage, the court accepts all the well-pleaded facts in Plaintiffs' Complaint as true, as well as all reasonable inferences drawn from those facts. *McGinley v. Houston*, 361 F.3d 1328, 1330 (11th Cir. 2004). Not only must the court accept the well-pleaded allegations as true, they must be construed in the light most favorable to the pleader. *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011). Defendants must establish that Plaintiffs' Complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). The City of Atlanta has not met that burden here.

## IV.   ARGUMENT

In its Argument, Defendant City of Atlanta deliberately ignores more than thirty-three pages of facts, fully supporting each and every element of Plaintiffs' Section 1983 claim; instead, the City endeavors to repel liability by repeatedly declaring Plaintiffs' Complaint "conclusory." Plaintiffs will demonstrate the City's disingenuousness below.

### A. Plaintiffs' have sufficiently alleged that the Defendant Officers were "acting under color of state law."

Somehow, the City sends eleven Atlanta police officers into an Atlanta community to serve an Atlanta arrest warrant on an Atlanta resident at an Atlanta address for a state-law offense alleged to have occurred in the City of Atlanta and, nevertheless, argues with a straight face that there is no "state action" sufficient to bring this case within the purview of Section 1983. It does this notwithstanding its own Agreement with the FBI that states the opposite in its plain terms.

While not entirely clear from its motion, it appears the City's position, unsupported by any analysis of Section 1983, *Monell*, or *Bivens*, is that the City's officers cannot, as a matter of law, be acting under color of state law by the mere fact that they were detailed to a joint task force. The Eleventh Circuit, however, has never articulated such a bright-line rule.

Indeed, the Eleventh Circuit has not directly addressed whether a local government may be liable under Section 1983 for conduct of its law enforcement

officers when the officers are working on a joint federal–local task force. But other federal courts and circuits have entertained the question of applicability of Section 1983 claims against local officers under such circumstances. Indeed, there is a split in the circuits with respect to whether officers operating on federal task forces can be held liable under Section 1983, as opposed to *Bivens*.[5]

The case of *Adams v. Springmeyer*, No. 11-790, 2012 U.S. Dist. LEXIS 71136 (W.D. Pa. May 22, 2012), however, provides a more detailed analysis of how the

---

[5] At least two other circuits, the First and Second Circuits, have decided § 1983 claims against law enforcement *officers* on federal task forces should be brought as *Bivens* claims. *See DeMayo v. Nugent*, 517 F.3d 11, 14 n.5 (1st Cir. 2008); *Guerrero v. Scarazzini*, 274 F. App'x 11, 12 n.1 (2d Cir. 2008). The Sixth Circuit recently held that a local law enforcement officer working full time for a federal task force was subject to liability under *Bivens* rather than § 1983. *See King v. United States*, 917 F.3d 409, 433 (6th Cir. 2019), *cert. granted*, *Brownback v. King*, 2020 U.S. LEXIS 1959, *1, 140 S. Ct. 2563, 206 L. Ed. 2d 495 (2020), *cert. denied*, *King v. Brownback*, 2020 U.S. LEXIS 2013, *1, 140 S. Ct. 2565, 206 L. Ed. 2d 496 (2020) (denying the petition for writ of cert. regarding the *Bivens*/§ 1983 issue). The First and Second Circuit cases construing § 1983 claims as *Bivens* claims are unpersuasive—both courts summarily disposed of the issue in a footnote without performing the § 1983 "color of [state] law" analysis. *See DeMayo*, 517 F.3d at 14 n.5; *Guerrero*, 274 F. App'x at 12 n.1. And even though the Sixth Circuit analyzed the issue, the facts in *King* are materially different than the facts in the instant case.

Therefore, none of these cases would support the City's position that it cannot be held liable here. *Demayo*, *Guerrero*, and *King* <u>all</u> address whether claims against *individual officers* are properly brought under *Bivens* or § 1983. The cases do not address whether a *municipality* may be subject to § 1983 liability for its responsibility for enforcing laws, regulations, policies, and personnel rules applicable to officers when that government has expressly retained that obligation/authority while approving its officers' voluntary participation in a federal task force.

question of "color of law" must be approached in facts similar to those in the instant case at the motion to dismiss stage. In *Adams,* members of a joint FBI drug task force entered plaintiffs' home in the early morning of March 3, 2011, to execute an arrest warrant on an individual who had not resided there for almost two years. Defendants "broke down the doors of plaintiffs' home, forced them outside by shouting profanities and pointing assault weapons at them, and refused to answer any of their questions until they had assembled on the sidewalk." *Id.* at *2.

Defendant Springmeyer, the only named defendant and purported supervisor of the task force, was an FBI agent. As in the instant case, Defendant Springmeyer moved to dismiss the amended complaint under Rule 12(b)(6) arguing, *inter alia*, that plaintiffs cannot bring a Section 1983 claim against her because, as an FBI agent, she was not acting under color of state law. *See id.* at *14.

Plaintiffs, as here, argued defendant was a state actor to the extent that she was participating in a joint federal/state/local drug task force supervising the execution of an arrest warrant issued by a state court. *See id.* at *15. According to defendant, any claims against her should be brought only under *Bivens* because she was a "federal actor." *See id.*

The *Adams* court affirmed that "[a]n action under the color of state law requires that one liable under § 1983 have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the

authority of state law." *Id.* at *17. A person may be found to be a state actor, the *Adams* court concluded, when (1) he is a state official, (2) he acted together with or had obtained significant aid from state officials, or (3) his conduct is, by its nature, chargeable to the state. *See id.* (citations omitted).

Because Plaintiffs had pled in their complaint that Defendant Springmeyer was a participant in a "state or local drug task force" executing "an arrest warrant issued by a state court," the court found these facts were "sufficient to illustrate that . . . Defendant Springmeyer acted under color of state law." *Id.* at *18. Moreover, the court held that the motion to dismiss should be denied because defendant was "acting under the color of state law even by virtue of her interactions with the other John Doe Defendants [who were local police officers]." *Id.*[6]

Other courts have similarly held that joint task force members, depending on the facts of the case, can be acting under color of state law and can be liable under Section 1983 for constitutional violations. *See Couden* v. *Duffy*, 446 F.3d 483 (3d Cir. 2006) (local law enforcement officers who were members of the federal Delaware Joint Violent

---

[6] Subsequently, in *Adams v. Springmeyer*, 17 F. Supp. 3d 478 (W.D. Pa. 2014), the court later granted summary judgment in favor of defendant officers and Springmeyer, finding that the record developed in discovery demonstrated that the officers were in fact "federal actors." This was primarily based on the fact that the investigation was exclusively a federal investigation and the arrest warrants were exclusively federal arrest warrants. *Id*. at 506.

Crime Fugitive Task Force were properly sued under section 1983 for excessive force for actions undertaken in botch undercover surveillance operation); *Johnson* v. *Orr*, 780 F.2d 386, 390 (3d Cir. 1986) (holding that "[t]here is no set formula for determining whether the employees of an agency with both state and federal characteristics act under color of state law. All of the circumstances must be examined to consider whether the actions complained of were sufficiently linked to the state."); *Aikman v. County of Westchester*, 491 F. Supp. 2d 374, 379-80 (S.D.N.Y. 2007) (Westchester police officer who was deputized as a DEA task force agent was not a federal employee and thus was properly sued under section 1983). *Cf. Pettiford v. City of Greensboro*, 556 F.Supp.2d 512 (M.D. N.C. 2008) (denying City's motion to dismiss section 1983 claim, holding that whether there was state or federal action was an evidentiary question more properly dealt with on summary judgment).

Well-settled Supreme Court and Eleventh Circuit jurisprudence for determining whether a party can be considered to be acting under color of state law for purposes of Section 1983 liability is also instructive: "To satisfy section 1983's 'under color of [state] law' requirement, a plaintiff must demonstrate that 'the conduct allegedly causing the deprivation of a federal right [is] fairly attributable to the State.'" *Gene Thompson Lumber Co. v. Davis Parmer Lumber Co.*, 984 F.2d 401, 403 (11th Cir. 1993) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S. Ct. 2744, 2753, 73 L. Ed. 2d 482 (1982)). Further, Section 1983 must be

"liberally and beneficially construed" with "the largest latitude consistent with the words employed . . ." *See Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 400 n. 17 (1979) (holding that the requirement of federal approval of a compact between states to create a land management agency did not foreclose a finding that respondents' conduct was "under color of state law" within the meaning of § 1983).

The test applied by the Supreme Court for determining whether a person acts "under color of state law" considers the totality of the circumstances. *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961). There must be a determination, first, whether "the deprivation [was] caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or *by a person for whom the State is responsible*." *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982); *see Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 620–622 (1991) (applying *Lugar* factors) (emphasis added). "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.*

Similarly, the Eleventh Circuit considers (i) whether the party is performing functions "traditionally [within] the exclusive prerogative of the state" or (ii) whether "the state has so far insinuated itself into a position of interdependence with the [party] that it was a joint participant in the enterprise." *Willis v. University Health Servs.*, 993 F.2d 837, 840 (11th Cir. 1993) (quoting *National Broadcasting Co.*,

*Inc. v. Communications Workers of America, AFL-CIO*, 860 F.2d 1022, 1026–27 (11th Cir. 1988)).

Contrary to Defendant's conclusory assertions, Plaintiffs have alleged facts sufficient to show that the Defendant officers were acting under color of *state* law and thus were properly sued under Section 1983. First, it is undisputed the APD officers lent to the AMMO Task Force were "state actors" inasmuch as they were employed by, supervised by, and held accountable to the City of Atlanta in all aspects of their employment, thus making them "persons for whom the state was responsible," pursuant to *Lugar. See Lugar* at 937. In fact, Defendant City ensured that it remained responsible for APD task force officers when it permitted the officers to retain their roles within APD; when it included in the task force Agreement its express power to enforce laws, regulations, policies, and personnel rules applicable to APD officers; and when the FBI agreed APD officers would continue to report to APD for all administrative matters. *See* Compl. ¶ 23 ("The agreement in effect between APD and the FBI provided (a) that APD officers participating on the AMMO Task Force would be governed by the laws, regulations, policies (including use of force policies), and personnel rules applicable to APD officers and (b) that APD officers would report to APD for all administrative matters."). Given that APD explicitly agreed that the AMMO Task Force officers would be governed by APD policies and procedures, including its

use-of-force policies, the City is the correct entity to hold liable for those officers'
unconstitutional use of force under § 1983/*Monell* because each of them was
violating "a rule of conduct imposed by the state" and was "a person for whom
the State is responsible." *Id.*

Second, when the City's employee, Defendant Kim, shot and killed Mr.
Atchison, he and other Defendant officers were performing functions
"traditionally [within] the exclusive prerogative of the state" because they were
operating within the State of Georgia executing a Georgia state-law warrant on a
Georgia citizen suspected of a violation of Georgia state law. *See Willis*, 993 F.2d at
840. The City has engaged in no analysis sufficient to support their position that
that the mere fact of a state actor's participation in a federal task force performing
exclusively state-law functions within the same state should automatically grant
to those actions the "color of federal law" status. Indeed, several courts addressing
the question, described herein, have drawn the opposite conclusion.

Because Plaintiffs allege that the City maintained exclusive control over its
employees working with the AMMO Task Force; because the City routinely
allowed APD officers to violate its body-camera requirement; because the City
knew excessive force was an ongoing problem for APD and for the officers lent to
the AMMO Task Force; and because Plaintiffs' claims against the City are the
result of the City's decision to participate in the AMMO Task Force while both

retaining authority over enforcement and then failing to enforce its laws, regulations, policies, and personnel rules applicable to its officers, the Court should hold that Plaintiffs state a § 1983 claim against the City for the killing of Mr. Atchison as well as Plaintiffs' other injuries.

### B.   Plaintiffs allege sufficient facts to state a § 1983 claim against the City under *Monell*.

Under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), "municipalities may only be held liable [under § 1983] for the execution of a governmental policy or custom." *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997). Contrary to Defendant's assertion in section III(c)(iii) of its motion, however, a plaintiff need not show that the local government had a formal policy condoning unconstitutional conduct to establish *Monell* liability. *See Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1307–08 (11th Cir. 2001). "[A] widespread practice that, 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law'" is sufficient for liability under *Monell*. *Id.* (quoting *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991)).

Additionally, "a municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy 'if the municipality tacitly authorizes these actions or displays deliberate indifference'

towards the misconduct." *Griffin*, 261 F.3d at 1307–08 (quoting *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987)). In particular, "[a] municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a 'custom or policy' if the municipality tacitly authorizes these actions or displays deliberate indifference towards the police misconduct." *Brooks*, 813 F.2d at 1193. Indeed, "the continued failure of the city to prevent known constitutional violations by its police force is precisely the type of informal policy or custom that is actionable under section 1983." *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986).

Here, Plaintiffs' allegations are sufficient to state a § 1983 claim against the City under *Monell*. In particular, Plaintiffs allege that the City routinely and "continually ignored officer violations of its body-camera requirements," knowing that the body camera policy was "specifically designed to discourage [or prevent]" unconstitutional conduct." Compl. ¶¶ 43–46. As stated in Plaintiffs' Complaint, the City's routine acquiescence to its officers violating the City's own policy on body cameras while working for a federal task force constitutes a policy and/or practice of exempting officers from the City's body-camera requirement. *Id*. ¶ 140.

Plaintiffs also allege that the City knowingly maintained a custom, policy, pattern, and/or practice of "encouraging AMMO Task Force officers to routinely and falsely invoke federal jurisdiction on purely state matters by illegally

obtaining UFAP Warrants so the City could avail itself of the benefits, including financial benefits, of a partnership with the FBI." *Id*. ¶ 131; *see also id*. ¶ 141 ("[T]he City of Atlanta, through APD, had a policy and practice of allowing its officers to seek UFAP Warrants through the AMMO Task Force when its officers did not have sufficient basis for concluding the subjects of those warrants were interstate flight risks."). This policy and/or practice is evidenced by Defendant Kim's testimony that he "routinely" obtained UFAP Warrants in state-law cases to invoke federal jurisdiction. *Id*. ¶ 142. Additionally, the City "had a pattern and practice of allowing its AMMO Task Force officers to routinely enter the homes of citizens unlawfully by threat and coercion, under guise of 'looking for fugitives,' without proper search warrants and without justification for doing so." *Id*. ¶ 146.

Moreover, Plaintiffs allege that the City "has a custom, policy, pattern, procedure, and practice of not exercising sufficient supervision and oversight to ensure its officers did not violate APD policies;" failing to train, supervise, control, discipline, and/or otherwise screen its officers; and that the City knew or should have known that the policies and procedures of its police department—"including its screening, hiring, training, supervision, and disciplinary processes; processes for work assignments; and termination processes"—were severely deficient. *Id*. ¶ 132, 133. The City's knowledge of its deficient policies and procedures is evidenced by citizen complaints about excessive use of force by its officers,

including the AMMO Task Force officers. *Id.* ¶ 132.

And Plaintiffs sufficiently allege that all of these City laws, regulations, policies, and personnel rules led to violations of their constitutional rights. Specifically, the City laws, regulations, policies, and personnel rules enumerated above allowed the officer Defendants to wrongfully obtain federal jurisdiction over Mr. Atchison's arrest and execute the unlawfully obtained fugitive warrant for his arrest without their body cameras. The City's failure to stop such conduct, as well as its failure to adequately address the known uses of excessive force in the APD, led to Defendant Kim using excessive force against Mr. Atchison as well as the other constitutional violations alleged in Plaintiffs' Complaint. *See Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986) ("[T]he continued failure of the city to prevent known constitutional violations by its police force is precisely the type of informal policy or custom that is actionable under section 1983.").

Defendant City disingenuously dismisses the instances provided by Plaintiffs of specific use of excessive force complaints by its officers as "isolated incidents" without acknowledging that Plaintiffs' list of officers receiving those complaints include several of the participants in the AMMO Task Force action the day Defendant Kim shot Mr. Atchison, including Defendant Kim. *See* Def.'s Mot. to Dismiss at p. 10.

Additionally, Defendant concludes, without citation to or analysis of *Bivens,*

that Plaintiffs' claims arise under that case rather than *Monell*. *See* Def.'s Mot. to Dismiss at p. 6. It is unclear, however, from review of Defendant's argument precisely why it believes *Bivens* is more appropriate for Plaintiffs' claims against the City than *Monell*.[7]

Construing all of the Complaint allegations in a light most favorable to Plaintiffs, Plaintiffs have sufficiently stated a § 1983 claims against the City under *Monell*. *See Fundiller v. Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985) (reversing the district court's grant of summary judgment for the city because the plaintiff alleged that the city "act[ed] with gross indifference to the conduct engaged in by its police officers, including repeated failures to follow police procedure, unnecessary use of excessive force, roughness, and shootings at the time of making arrests, intimidation during arrests and booking procedures, and drug trafficking," creating a custom of allowing the use of excessive force); *Rogers v. City of Atlanta*, 214 F. Supp. 3d 1314, 1318 (N.D. Ga. 2016) (holding that the plaintiff sufficiently alleged a claim against the city where the plaintiff alleged that the city (1) maintained a system of review of police conduct which is so untimely and cursory as to be ineffective and to permit and tolerate the unreasonable excessive and deadly use of force by police officers; (2) allowed APD officers to use

---

[7] *See* analysis *supra* pp. 8-15.

unreasonable and deadly force without justification; and (3) failed to train and supervise APD officers"); *Murdock v. Cobb County*, 2013 U.S. Dist. LEXIS 70203, *14–16, 2013 WL 2155465 (holding that plaintiff's allegations that the county knew the defendant officer's misconduct and failed to take any remedial action were sufficient to allege an informal policy or custom and maintain a § 1983 claim against the county). Accordingly, this Court should deny Defendants' motion to dismiss.

### C.   Plaintiffs have not sued the City for wrongful death.

The City also claims that it is entitled to official immunity for Plaintiffs' wrongful death claim (Claim 8). Plaintiffs explicitly assert Claim 8 against Defendant Kim "in his individual capacity," however.

Because the City has not been sued for wrongful death, Plaintiffs do not address the City's argument that the Court should dismiss that claim based on official immunity. Nor has counsel for the City indicated that they seek to represent Defendant Kim in his individual capacity or that they seek dismissal of claims against Defendant Kim in his individual capacity. *See* Def.'s Mot. to Dismiss at p. 3 n.7, 13.

Thus, Plaintiffs do not address the dismissal of any claims against Defendant Kim, individually, in this Response. If the Court interprets the City's motion as seeking dismissal of any claim against Defendant Kim individually,

Plaintiffs respectfully request an opportunity to respond to that new motion.

**V.**     **CONCLUSION**

Based on the above, Plaintiffs respectfully request that this Court deny the

City's motion to dismiss.

Respectfully submitted this 19th day of November 2020,

_/s/Tanya Miller_

Tanya F. Miller (GA Bar No. 508434)
DuBose Miller
75 14th NE, Suite 2110
Atlanta, GA 30309
Telephone: (404) 720-8111
miller@dubosemiller.com
Attorney for Plaintiffs

**CERTIFICATE OF TYPE STYLE**

This document was prepared using Book Antiqua 13-point font.

**CERTIFICATE OF SERVICE**

A copy of the foregoing *PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS* was served through the Court's electronic filing system this 19th day of November, 2020. Notice of this filing will be sent to the parties by operation of the Court's electronic-filing system.

/s/ Tanya F. Miller
Attorney for Plaintiffs